In re Galen E. WILLIAMS and
Helen E. Williams, Debtors.

In re B.S. PAPER SPECIALISTS,
INC., Debtor.

In re AND/OR CORPORATION, Debtor.

In re C.O. CORPORATION, Debtor.

Bankruptcy Nos. 88 B 07959 J,
87 B 05475 E, 89 B 01164 A
and 88 B 02005 E.

United States Bankruptcy Court,
D. Colorado.

Oct. 25, 1993.

Glen E. Keller, Jr., Davis, Graham & Stubbs, Denver, CO, for the Trustee, Kay Clements.

Leo Weiss, Denver, CO, for the U.S. Trustee.

## MEMORANDUM OPINION AND ORDER

ROLAND J. BRUMBAUGH, Bankruptcy Judge.

THESE MATTERS come before the Court upon the Trustee's Final Report and Application for Compensation in each of the above-captioned cases and the Objections thereto filed by the United States Trustee. These matters were consolidated for hearing purposes only and each case must be considered upon its own merits. However, each of these cases contains some common elements and questions. Each of these cases is a Chapter 7 case and Kay Clements is the Trustee in each case. In each case the U.S. Trustee asserts that the Trustee should not be allowed compensation, or at least, should not be allowed the full amount of compensation requested. The U.S. Trustee has no objection to any of the expenses claimed by the Trustee.

There are statutory limits on the compensation of a Chapter 7 trustee found in 11 U.S.C. § 326(a):

In a case under chapter 7 or 11, the court may allow *reasonable* compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed [various percentages upon moneys disbursed by the trustee in the case. [Emphasis added].

In each of these cases the U.S. Trustee asserts that in light of the Trustee's actions or inactions, the fees she has requested are not reasonable.

The Trustee claims that much of the delay in these cases was caused by the U.S. Trustee's refusal to process her Final Reports for about a year. The procedure is for trustees to submit their final reports to the U.S. Trustee for review and approval. If they are approved, the reports are forwarded to and filed with the Court. If they are not approved, they are returned to the trustees with requests for corrections or revisions. The Trustee testified that in 1987 it took about 3 to 4 months for the U.S. Trustee to review the Reports. She also testified that in 1988 the U.S. Trustee asked her to reduce all paralegal fees she had requested in each case and that when she refused, the U.S. Trustee refused to process any more of her Reports for about a year.

The testimony herein indicated that in December 1989 the U.S. Trustee returned 97 Final Reports to this Trustee and each had 1 to 3 pages of complaints. This, according to the Trustee's paralegal, backed up the Trustee's office for a considerable time, and the office was still working on some of these as late as July 1991.

In late 1991, this Court, in response to certain internal reports concerning hundreds of open cases that were filed as early as the late 1970s and early 1980s, began issuing orders to show cause to various trustees and to the U.S. Trustee directing that these old cases be closed. This prompted the U.S. Trustee to initiate a program nicknamed "Operation Docket Storm" to clean up these old cases.

*Williams—88 B 07959 J*

■ This case was filed June 16, 1988, and the Trustee was appointed soon thereafter. The primary asset of the estate was a pending lawsuit. In October 1988, the

Trustee initiated efforts to have an attorney appointed to represent the estate in that lawsuit and to prosecute the same. The Debtors were granted their discharge January 20, 1989.

On March 29, 1989, the Trustee filed a Motion for approval of a settlement of that litigation. On May 11, 1989, the Court approved the settlement. The settlement resulted in the payment of $125,000.00 to the Trustee, which she deposited in an interest bearing account on or about June 8, 1989. On or about June 9, 1990, she apparently released $50,000 to the counsel who litigated the lawsuit, and on or about June 8, 1989, she distributed the exempt portion of the moneys ($56,250.00) to the Debtors. This left approximately $19,000 in the estate.

According to the Trustee, she removed the funds from the interest bearing account in May 1991 in anticipation of closing the case. However, shortly thereafter she received a call from the Debtors' tax counsel indicating that the Debtors were being audited. Previously, she had the understanding that the funds received from the lawsuit were payments for personal injury claims and therefore not taxable. So she began negotiations with the IRS and Debtors' counsel. She claims that at any given point in time she thought the matter was to be resolved very soon. However, it took over a year. The Trustee settled the dispute with the IRS for $1,663, including $379 in interest, which she paid on September 2, 1992. On the same date, she also paid the Colorado Department of Revenue in connection with this lawsuit transaction the sum of $341, which included $103 in interest. Part of the settlement also was that the IRS waived any penalties.

In the meantime, on April 27, 1992, Debtors filed a Motion for an Order Directing Immediate Distribution of Funds from the Bankruptcy Estate to the IRS on its priority tax claim for *1986* taxes in the amount of $1,658. The Trustee's response was to file on May 8, 1992, an application to employ an accountant. On July 17, 1992, the Trustee and the Debtors filed a Stipulation whereby the Trustee would pay the IRS the $1,658.

The Trustee then filed a Final Report with the U.S. Trustee on or about September 1, 1992. But the U.S. Trustee returned the Report on September 28, 1992, requesting documentation regarding the $50,000 disbursed June 9, 1989;[1] copies of the tax returns filed in connection with the payments to the IRS and the Colorado Department of Revenue on September 2, 1992 (the date of these disbursements was obtained from the cancelled checks submitted with the Trustee's Final Report); and requesting that certain corrections or clarifications be made in the Report concerning $2,050 in non-exempt property in automobiles and $400 in non-exempt office equipment. No response was forthcoming. In January 1993, the U.S. Trustee made another request for the documents and information. Again, no response. Finally, on March 30, 1993, the Trustee submitted her revised Final Report which was reviewed, but not approved by the U.S. Trustee, and forwarded to and filed with the Court on May 3, 1993. There still is no explanation regarding the non-exempt equity in the Debtors' assets, nor is there a copy of the requested tax returns. The Trustee never redeposited the estate funds in an interest bearing account. The U.S. Trustee's Senior Bankruptcy Analyst estimated that because these funds were not held in an interest bearing account, the estate lost $1,095 in interest that could have been earned.

The Trustee indicated that the bank she was using made it very difficult to get final balances on accounts. Therefore, it was her practice to close out the account for an estate in anticipation of closing the estate. This is because before a case can be closed, trustees must submit bank statements showing final zero balances and the originals of all checks issued. And, because she believed that the matter with the IRS would be resolved soon, she never redepos-

1. It is still not clear how those funds were distributed from the bank account. Had the Trustee followed proper procedures by issuing a check, there would have been no problem, But apparently she had the funds disbursed by a wire transfer.

ited the finds of this estate in an interest bearing account.

This was a relatively simple case from the Trustee's point of view. There were few assets, and the primary asset (the lawsuit) was actually handled by outside counsel and settled within about nine months of the date the case was filed. The Court can understand why the Trustee initially withdrew the funds from an interest bearing account, and that it was reasonable not to redeposit them for a reasonable period of time during negotiations with the IRS. But anything more than a few months is not reasonable, especially when all it took was a telephone call to the bank to have the funds put back into an interest bearing account.

In addition, it was not until almost 4 years after the case was filed and after formal requests were filed with the Court by the Debtors that the Trustee decided to pay the allowed tax priority claim of the IRS for 1986 taxes.

Finally, no Final Report was filed with the U.S. Trustee until September 1992— one and one-half years after the lawsuit settled—and it was not acceptable. Indeed it is not acceptable now. There are no tax returns regarding the taxes paid in connection with the lawsuit proceeds, and there is no explanation as to why certain non-exempt property of the Debtors was not administered.

While it may be true that perhaps some of the delay in these old cases can be placed at the door of the U.S. Trustee, the delays here cannot. The Trustee argues that trustees should not be penalized for exercising reasonable discretion, *e.g.*, not immediately redepositing funds into an interest bearing account. This Court agrees with that general proposition. However, the delays and inaction here go beyond the reasonable exercise of discretion and judgment.

The Trustee claims that she was backlogged because of the 97 Reports returned to her at one time. However, there is not one iota of testimony that these Reports were wrongly or mistakenly returned.

Thus, the Court must presume that there was something wrong with those Reports that required their return. This is not the U.S. Trustee's fault. It is this Trustee's fault for not submitting proper Reports in the first place.

And even though the U.S. Trustee specifically does not challenge any of the expenses requested by the Trustee in this case, the Court would note that all through the time this case is open the Trustee must pay periodic bond premiums, and these are paid from estate funds. If this case had been handled in an expeditious manner, at least some of those premiums would not have been incurred.

The Trustee's actions and inactions in this case have resulted in delays and losses for the creditors of this estate and the expenditure of an inordinate amount of time by the U.S. Trustee and this Court in the administration of this estate.

### B.S. Paper Specialists—87 B 05475 E

■ This case was filed May 11, 1987, and the Trustee was appointed shortly thereafter.

In this case the U.S. Trustee asserts that the Trustee has failed to account for estate property consisting of $17,222.65 in accounts receivable.. In addition, it is asserted that the Trustee failed to oversee the activities of an auctioneer appointed to conduct an auction of estate property. The Order of December 7, 1987, authorizing the appointment of the auctioneer required that the auctioneer file a Return of Sale as required by Bankruptcy Rule 6004(e). No such Report was filed until July 22, 1993— about one and one-half months before the hearing herein. In addition, the auctioneer's report shows that the sales took place on December 3, 1987 (4 days prior to court approval), and March 22, 1988. Yet the proceeds of the sale were not tendered to the Trustee until May 9, 1989. Then it took the Trustee until October 1992 to issue a Notice of Possible Dividends to the creditors. Incidently, the auction grossed $1,440.50 and netted only $819.70.

The Final Report herein was not submitted to the U.S. Trustee until February 27, 1993—almost six years after the case was filed and five years after the last auction sale in March 1988. The U.S. Trustee returned the Report to the Trustee in April 1993 requesting corrections and additional information. When no response was forthcoming, the Report was filed with the Court.

The Trustee's Final Report still does not reveal why she has not administered the $17,222.65 in accounts receivable in the estate, nor is there any explanation for her actions or inactions in her oversight of the auctioneer.

This was a simple business Chapter 7 case. There was a total of only $1,587.90 collected in the estate, and after the Trustee's fees and expenses and those of the auctioneer, there remained only $440.53 to distribute to creditors—and that went to partially satisfy priority tax claims totaling $1,073.35. There is no reason given, and none can be guessed at, for this long delay in closing this estate. This delay has been prejudicial to the creditors and has caused the needless expenditure of Court and U.S. Trustee administrative time.

### AND/OR Corporation—89 B 01164 A

■ This case was filed January 27, 1989, and the Trustee was appointed shortly thereafter.

On July 24, 1989, the Trustee had an auctioneer pick up assets of the Debtor and place them in storage. It was not until March 21, 1991, that the Trustee filed an application to sell the property. On April 22, 1991, the Court issued a compliance order requiring changes in the Notice filed by the Trustee. On August 20, 1992—16 months later—the Trustee filed a new application and Notice to sell the property. On September 21, 1992, the Court again issued a compliance order requiring changes in the Notice. Finally, on September 30, 1992, the Trustee filed her third application and Notice, and the Court approved the Application on October 28, 1992. The sale took place December 17, 1992—three and one-half years after the property

was put in storage. The sale resulted in a *net loss* to the estate of $7.40, and this was even after there was no charge to the estate for the storage.

It also appears that the Trustee has not accounted for certain assets. The Debtor's schedules show $93,449.00 in inventory. There are two secured creditors claiming secured liens on the inventory totaling of $88,441.00. The balance of $5,008,00 has not been accounted for by the Trustee.

The gross amount collected by the estate was only $2,375.45, with a net of only $1,540.50 to unsecured creditors after the Trustee's and auctioneer's fees and expenses. Hardly a complicated case!

The unreasonable delays herein have been detrimental to the creditors and have caused needless expenditures of administrative resources by the Court and the U.S. Trustee's office.

### C.O. Corporation—88 B 02005 E

■ This case was filed February 2, 1988, and the Trustee was appointed shortly thereafter.

On March 23, 1988, the Trustee filed an application to appoint an auctioneer and a Notice. The Court, on April 14, 1988, issued a compliance order denying the application because of improper or insufficient service of the application and notice. On May 17, 1988, the Trustee filed a Motion to Reconsider, which was denied on May 20, 1988. Nevertheless, the sale went forward on April 12, 1988, and resulted in proceeds to the estate of $11,620.00, which were paid to the Trustee April 27, 1988. Nothing else was done by the Trustee until April 5, 1993—five years later—when she filed a Motion to Confirm the sale and the payment of $2,728.40 to the auctioneer. Chief Judge Matheson ultimately approved the Motion.

On April 5, 1993, the Trustee also filed a Motion to Confirm her hiring of a company to collect the Debtor's accounts receivable and payments for those services. There is no direct indication of when she hired the collection firm, but attached to the Motion

are letters from the firm dated in May 1988. Chief Judge Matheson ultimately approved the Motion.

The U.S. Trustee also asserts that the Trustee's proposed distribution of certain sales proceeds may not be proper in that it appears that the Trustee sold, at public auction, certain property that the Debtor indicated was leased from certain creditors. The U.S. Trustee is not certain if these were true leases or secured loans. The Trustee introduced two letters (Exhibits 2 and 3) from creditors that would indicate there is no problem. However, there was insufficient evidence produced at the hearing herein for the Court to make a determination as to the proper distribution of the sales proceeds.

The Trustee did not file a Final Report with the U.S. Trustee until April 1, 1993. When the U.S. Trustee raised questions regarding the distribution of the sales proceeds, the Trustee responded, but not to the satisfaction of the U.S. Trustee. So the U.S. Trustee filed the Report with the Court on June 11, 1993.

There is no excuse offered, and none can be imagined, for the extreme delay by the Trustee in this case, nor for the conduct of an auction without court approval, nor for the hiring of a collection firm without court approval. There are substantive questions as to whether the proposed distribution of the Trustee is proper. If the Trustee and the U.S. Trustee have genuine disagreements over that issue they should file appropriate pleadings, with proper notice to interested parties, and let the Court decide the issue. Delaying the closing of the estate while the two sides argue about it is of no benefit to anyone.

The U.S. Trustee asserts that because of actions and inactions of the Trustee in these cases, all compensation in these cases should be denied and cites in support thereof the case of *In re Ducharme*, 39 B.R. 681 (Bankr.D.R.I.1984). That case also involved a trustee engaged in dilatory conduct which impinged on the rights of creditors and the administrative functions of the court.

As stated *supra*, each of these cases must be considered on its own merit. However, these cases also show a pattern of delay and neglect by the Trustee and, as did the Rhode Island court, I must also take that pattern into consideration. Based upon the findings herein, it is

ORDERED that any compensation to the Trustee in these cases would be unreasonable and therefore such compensation is denied in each case. It is

FURTHER ORDERED that each of the Final Reports filed in these cases is found to be deficient, and each such Report is disapproved.